UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANA LUDWIG, as Independent Administrator of the Estate of Brent Ludwig, deceased, | ) ) | |
| | ) | 17 C 2943 |
| Plaintiff, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**AMENDED MEMORANDUM OPINION AND ORDER**</u>

Dana Ludwig brings suit for negligence and wrongful death under the Federal Tort

Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, on behalf of the estate of her deceased husband,

Brent Ludwig, who died in a tragic hiking accident in the Mount Hood Wilderness. Doc. 1. The

United States moves for summary judgment, Doc. 72, and Dana moves to strike two declarations

submitted by the United States to support its summary judgment motion, Docs. 87-88. Dana's

motions to strike are denied in part and denied as moot in part, and the United States' summary

judgment motion is granted.

**Background**

The court recites the facts as favorably to Dana as the record and Local Rule 56.1 permit.

*See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this

juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates

v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Brent died in a hiking accident in the Mount Hood Wilderness in Oregon on August 12,

2014. Doc. 86 at ¶¶ 1, 3. The Wilderness covers nearly 65,000 acres of land designated under

the Wilderness Act of 1964. *Id*. at ¶¶ 6, 31. Motor vehicles are not allowed within the

Wilderness. *Id.* at ¶ 34. The Wilderness lies within the larger Mount Hood National Forest. *Id.* at ¶ 31. Both are administered by the United States Forest Service. *Id.* at ¶ 8.

In August 2014, Dana, Brent, his brother James Ludwig, and James's wife Ellen Ludwig traveled to Oregon from their homes in Illinois for a vacation. Doc. 86 at ¶ 3; Doc. 75-14 at 38:9-39:18. They rented a house near Mount Hood. Doc. 75-14 at 38:15-18. On the morning of August 12, Nathan Johnson, a childhood friend of Brent and James, came to meet the Ludwigs from his home nearby. Doc. 75-15 at 5:16-17, 6:24-25, 17:1-12. Johnson planned to take the group on a hike to Ramona Falls, a waterfall on the Sandy River in the Mount Hood Wilderness. *Id.* at 16:5-7; Doc. 86-25 at 1.

There is a maintained hiking trail to Ramona Falls that starts at the Ramona Falls Trailhead, which is within the Mount Hood National Forest a quarter mile outside the boundary of the Wilderness. Doc. 86 at ¶¶ 39-40. About one mile into the hike, within the Wilderness, the trail crosses the Sandy River downstream from the falls. *Id.* at ¶ 3; Doc. 86-25 at 1. On August 12, 2014, a "seasonal bridge" was in place at the crossing. Doc. 86 at ¶ 11. From 1995 to 2014, a Forest Service employee placed the bridge at the crossing every Spring and then removed it every Fall. *Id.* at ¶¶ 9, 11; Doc. 94 at ¶ 57. The bridge was not affixed to the streambed in any way. Doc. 94 at ¶ 57. Photographs of the bridge show that it was a rudimentary 20-foot-long wooden plank with no handrails. Doc. 86 at ¶¶ 11, 13; Docs. 75-8, 75-9.

Johnson knew that to drive to the Ramona Falls Trailhead, the hiking party needed to purchase "day-use" passes for both their vehicles, Johnson's car and the Ludwigs' rental car. Doc. 75-15 at 18:4-19:6; Doc. 75-16 at 23:13-24:25. Johnson drove alone to a ranger station and purchased two $5 daily passes, one for each vehicle. Doc. 86 at ¶¶ 43, 48, 50-51. The pass is designed to hang from a car's rearview mirror. Doc. 75-7. Both sides of the pass state,

2

"National Forest Recreation Pass" and "DISPLAY IN VEHICLE." *Id*. at 1-2. The date "8/12/14" is handwritten in marker on the front side of the pass. *Id*. at 1. On the back side, the pass states: "The Recreation Day Pass is a vehicle pass honored at day-use sites in Oregon and Washington where 'Recreation Pass Required' signs are posted." *Id*. at 2.

After Johnson bought the passes, he and the four Ludwigs made the 15-minute drive from their rental house to the Ramona Falls Trailhead. Doc. 75-14 at 45:8-14; Doc. 75-15 at 20:25-21:6; Doc. 75-16 at 24:13-25:10. The weather was sunny and warm on the hike to Ramona Falls. Doc. 75-14 at 58:12-14; Doc. 75-15 at 40:3-5; Doc. 75-16 at 31:2-12. The hiking party crossed the Sandy River seasonal bridge without incident and arrived at the falls. Doc. 75-14 at 59:17-60:7. It began to rain as they ate lunch, and the rain continued as they hiked back toward the trailhead. *Id*. at 60:8-23; Doc. 75-15 at 40:6-16; Doc. 75-16 at 34:15-35:2. By the time they again reached the bridge, it had stopped raining or was barely drizzling. Doc. 94 at ¶ 63.

Brent was the last of the hiking party to start across the bridge. Doc. 86 at ¶ 5. As he was walking across, a log jam 100 feet upstream burst and sent a wave of water and debris 5 to 8 feet high rushing toward the bridge. *Ibid*.; Doc. 94 at ¶ 64. Johnson, who was almost across the bridge, saw "a wave of water and larger debris" and "felt the bridge lift and turn." Doc. 75-15 at 42:25-43:2. Johnson and Brent were thrown into the water. *Id*. at 43:4-12; Doc. 75-14 at 103:14-20. Brent drowned as he was swept downstream. Doc. 86 at ¶ 5. The Forest Service has not replaced the bridge since its destruction that day. Doc. 94 at ¶ 91.

In 2016, Dana presented a negligence and wrongful death claim to the Forest Service. Doc. 12 at ¶ 2. Six months passed without final disposition of her claim, and Dana deemed that delay a denial pursuant to 28 U.S.C. § 2675(a). *Id*. at ¶ 4. She then filed this suit, bringing the same claim. Doc. 1 at ¶¶ 24-26, 29.

## Discussion

The United States moves for summary judgment based on two affirmative defenses. Docs. 72, 81.  First, the United States argues that the suit is barred by the FTCA's discretionary function exception.  Doc. 81 at 17-24; *see* 28 U.S.C. § 2680(a) (barring "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty … whether or not the discretion involved be abused").  Second, the United States argues that it has immunity under the Oregon recreational use statute.  Doc. 81 at 24-28; *see* Or. Rev. Stat. §§ 105.672-.696.  Because summary judgment is warranted based on the Oregon statute, there is no need to address the discretionary function exception.

## I.      Dana's Motions to Strike

Before addressing the Oregon recreational use statute, the court considers Dana's motions to strike two declarations that the United States submits to support its summary judgment motion.  Docs. 87, 88.  The first declaration is from John Kattell, the national bridge engineer for the Forest Service.  Doc. 75-4 at ¶ 1.  Kattell's declaration describes the Forest Service's bridge construction policies, a topic relevant only to the United States' discretionary function exception defense.  Because the court's summary judgment ruling does not rely on that exception, Dana's motion to strike Kattell's declaration is denied as moot.

The second declaration is from Jennifer Watts, the Business Public Services Staff Officer for the Mount Hood National Forest.  Doc. 75-5 at ¶ 1.  Dana argues that Watts's declaration should be stricken as a "sham affidavit" because its averments are "inconsistent with [her] deposition testimony and the documentation provided by the Forest Service."  Doc. 88 at 2.

In certain circumstances, a district court may refuse to consider a "sham affidavit" submitted at summary judgment.  Specifically, "[a] 'sham affidavit' is an affidavit that is inadmissible because it contradicts the affiant's previous testimony … unless the earlier

4

testimony was ambiguous, confusing, or the result of a memory lapse." *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). It is unlikely that the sham affidavit rule can be invoked against the *moving* party. As the Seventh Circuit recently explained, Civil Rule 56 "requires a judge to scrutinize the substance of an affidavit offered *in response* to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (emphasis added). The sham affidavit rule ensures that "a *genuine* issue of material fact cannot be conjured [by the non-movant] out of nothing." *Id*. at 316. But when a movant submits contradictory evidence, summary judgment is denied in the ordinary course based on the fact dispute inherent in that evidence, without resort to the sham affidavit rule. *See Allen v. Chi. Transit Auth.*, 317 F.3d 696, 699-700 (7th Cir. 2003) ("When a witness repeatedly contradicts himself under oath on material matters … the witness's credibility becomes an issue for the jury; it cannot be resolved in a summary judgment proceeding."). Although the Seventh Circuit has not squarely addressed the question, the Sixth Circuit has held that "the logic and purpose of the [sham affidavit] doctrine do not apply when a party *moving* for summary judgment submits an allegedly contradictory affidavit with its summary judgment motion." *Reed v. City of Memphis*, 735 F. App'x 192, 198 (6th Cir. 2018).

Assuming for the sake of argument that the sham affidavit rule can apply against a moving party, Watts's declaration is not a sham affidavit. The pertinent question under the rule is whether Watts's declaration contradicts her own prior deposition testimony. *See Cook*, 803 F.3d at 298. Much of Dana's argument, however, charges that Watts's declaration is factually inconsistent with *other* parts of the record. Doc. 88 at 5-6, 8-14. Such an argument does not fall within the writ of the sham affidavit rule. If an averment in a summary judgment movant's

5

declaration is contradicted by parts of the record other than the witness's deposition testimony, then there is a factual dispute, period, with no need to invoke the rule.

Dana's motion to strike does briefly maintain that there are inconsistencies between Watts's declaration and three passages from her deposition testimony. In the first, Watts testified that a "valid recreation pass" is required for the Ramona Falls Trailhead. Doc. 88 at 4. In the second, Watts testified that the fee charged for the recreation pass is an authorized "standard amenity recreation fee" under the Federal Lands Recreation Enhancement Act ("FLREA"). *Id.* at 6; *see* 16 U.S.C. § 6802(f). In the third, Watts explained that, under the FLREA, the Forest Service can charge such a fee only if it provides certain amenities in addition to parking, such as picnic tables and a permanent toilet. Doc. 88 at 7-8. The court will address in detail the substance of these matters in the Discussion section below. For now, it suffices to say that Watts attests to the same facts in her declaration. Doc. 75-5 at ¶¶ 26-27 (explaining the recreation pass requirement); *id.* at ¶ 29 (noting that the charge for the pass is called a "recreation fee"); *id.* at ¶ 31 (referring to "amenities at the trailhead other than the parking lot"). Because there are no inconsistencies in these respects between Watts's deposition testimony and her declaration, Dana's motion to strike the declaration's averments regarding the recreation pass and associated fee is denied.

Dana also argues that Watts's declaration makes statements regarding the Sandy River seasonal bridge that either are inconsistent with her deposition testimony or comprise inadmissible expert testimony. Doc. 88 at 10-15. Like Kattell's declaration, those parts of Watts's declaration are not relevant to the United States' defense under the Oregon recreational use statute, so that portion of Dana's motion is denied as moot.

## II.     The United States' Summary Judgment Motion

The FTCA "waives the federal government's sovereign immunity only insofar as the defendant, were it not the government, would be liable to the plaintiff under the law of the state in which the conduct that is alleged to be tortious occurred." *Matheny v. United States*, 469 F.3d 1093, 1094 (7th Cir. 2006) (citing 28 U.S.C. §§ 1346(b)(1), 2674); *see* 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity and conferring jurisdiction on the federal courts in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"); *id*. § 2674 ("The United States shall be liable … in the same manner and to the same extent as a private individual under like circumstances … ."). The United States may assert any "substantive limitation" on liability under state law that a private person could assert in like circumstances. *Augutis v. United States*, 732 F.3d 749, 754 (7th Cir. 2013).

As noted, the United States argues that Dana's claims are barred by the Oregon recreational use statute, Or. Rev. Stat. §§ 105.672-.696. Doc. 81 at 24-28. Under that statute, "[a] landowner is immune from suit for injuries that arise out of the recreational use of its land when the owner 'permits any person to use the land for recreational purposes[.]'" *Coleman v. Or. Parks & Recreation Dep't ex rel. State*, 217 P.3d 651, 652 (Or. 2009) (quoting Or. Rev. Stat. § 105.682(1)). The statute defines "land" as "all real property, whether publicly or privately owned," Or. Rev. Stat. § 105.672(3), and thus applies to federal land like the Mount Hood Wilderness. *See Kelly v. Hochberg*, 243 P.3d 62, 67 (Or. 2010) (holding that the Bureau of Land Management could assert immunity under the statute); *O'Neal v. United States*, 814 F.2d 1285, 1287 (9th Cir. 1987) (same); *see also Matheny*, 469 F.3d at 1096 (holding that an analogous Indiana statute applied to an FTCA suit brought against the United States based on an occurrence at the Indiana Dunes National Lakeshore, reasoning that the FTCA "requires that the federal

government be treated no worse in a tort suit than if it were a private entity"). And there is no dispute that Brent was using the Mount Hood Wilderness for "recreational purposes," a term that the statute defines to include "hiking." Or. Rev. Stat. § 105.672(5).

In seeking to defeat the United States' invocation of the recreational use statute, Dana relies on an exemption in the statute that lifts immunity "if the owner makes any charge for permission to use the land for recreational purposes." *Id.* § 105.688(3). It is undisputed that Johnson purchased two $5 passes on the morning in question. Doc. 86 at ¶¶ 45, 50. To support her argument that the statutory exemption applies, Dana points to *Coleman*, where the Oregon Supreme Court held in a suit involving an accident at a state park that the exemption stripped the State of immunity because it charged camping fees at the park. 217 P.3d at 655. After the *Coleman* decision, however, the Oregon legislature amended the recreational use statute to allow landowners to assess certain charges without forfeiting their immunity. *See* 2010 Or. Laws Sp. Sess. Ch. 52, §§ 1-2. Pertinent here, the amendment revised the definition of the term "charge" to exclude any "parking fee of $15 or less per day." Or. Rev. Stat. § 105.672(1)(c).

Accordingly, the United States remains immune under the recreational use statute if the $5 fee that Johnson paid for each pass qualifies as a "parking fee" under Or. Rev. Stat. § 105.672(1)(c). The statute does not define the term "parking fee." In arguing that the fee Johnson paid was *not* a "parking fee," Dana relies primarily on the fee's name, noting that the FLREA calls it a "standard amenity recreation fee," 16 U.S.C. § 6802(f)—not a parking fee—as does the Forest Service manual, Doc. 86-27 at 12. Doc. 85 at 30-31. In arguing that the fee Johnson paid *was* a "parking fee," the United States presses a more functional definition, arguing that only visitors who parked had to pay the fee and that the fee was assessed per vehicle, not per person. Doc. 81 at 26-27.

Resolution of the parties' debate turns on whether form or substance controls interpretation of the term "parking fee" under Oregon law.  Although the Oregon Supreme Court has not interpreted that precise term, it has had occasion to categorize various government levies as either a "tax," an "assessment," or an "excise," and its interpretive methodology is instructive here.  In determining whether one Oregon levy was an unlawful "tax" or, rather, a lawful "assessment," the Court explained that "[t]he distinction … is one of function, not nomenclature."  *Dennehy v. Dep't of Revenue*, 756 P.2d 13, 17 (Or. 1988).  Likewise, in *Automobile Club of Oregon v. State*, 840 P.2d 674 (Or. 1992), the Court held that "the character of a levy is determined by its function, not by the label the legislature attaches to it."  *Id*. at 682.  And in *Keller v. Department of Revenue*, 872 P.2d 414 (Or. 1994), which asked whether a certain Washington tax could offset Oregon income taxes, the Court held that it must "examin[e] the substance and practical effect of that tax, not only its label under Washington law."  *Id*. at 415.  Under the methodological approach consistently taken by the Oregon Supreme Court, then, the label that Congress and the Forest Service gave the $5 recreation pass matters little, if at all.  Rather, it is the function the pass served that is dispositive in determining whether it qualifies as a "parking fee" within the meaning of the recreational use statute.

Consistent with the Oregon Supreme Court's functional approach, the Court of Appeals of Oregon ruled that the question whether a levy qualifies as a "parking fee" under the recreational use statute turns on the levy's function, not its label.  *See McCormick v. State ex rel. Or. State Parks & Recreation Dep't*, 308 Or. App. 220, 2020 WL 7978176, at *2 (Or. App. 2020).  Like Dana here, the plaintiff in *McCormick* argued that a $5 fee charged at a state park was not a "parking fee" because the pertinent state agency "called the park a 'day use fee area.'"  Appellant's Opening Brief at 28, *McCormick v. State*, 308 Or. App. 220 (Or. App. 2020) (No.

9

A159931), 2015 WL 12720437. The Oregon appellate court rejected that argument. The court held that "[t]he ordinary meaning of the phrase 'parking fee' [in the recreational use statute] … is a fee charged for the privilege of parking." *McCormick*, 2020 WL 7978176, at *2. And finding no factual dispute that "the state charged the fee for the privilege of parking," the court held that the immunity granted by the statute entitled the State to summary judgment. *Ibid*.

The Oregon appellate court's ruling is significant. Where, as here, "[a] state's supreme court has not yet addressed [an] issue, [a] federal court should consult and follow the decisions of intermediate appellate courts to predict how the supreme court would act given the chance, unless there is a convincing reason to predict the state's highest court would disagree." *In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018) (internal quotation marks omitted). Here, there is no reason to predict the Oregon Supreme Court would disagree with the appellate court's interpretation of the term "parking fee" in the recreational use statute. To the contrary, the appellate court's ruling was fully consistent with the Oregon Supreme Court precedents discussed above. Accordingly, this court adopts the same methodological approach and focuses on the function, not the name, of the $5 levy Johnson paid for each of the two passes he purchased.

Given the foregoing, the court interprets the statutory term "parking fee" in a functional manner to mean: a fee that a recreational user must pay only if the user parks a vehicle at the recreational site. This definition has two essential components: (1) if a user parks at the recreational site, she must pay the fee; and (2) if a user does not park at the recreational site, she need not pay the fee. Summary judgment for the United States is required unless a reasonable juror could find that one of these statements is false at the Ramona Falls Trailhead as to the $5 fee that Johnson paid.

There is no debate as to the first component of the definition. Dana admits that everyone who parks at the Ramona Falls Trailhead "must purchase and display a valid pass in their vehicle." Doc. 86 at ¶ 47. There are multiple ways to pay a fee, not only the $5 daily pass, but also an annual pass—the "Northwest Forest Pass," which is valid for national forests in Oregon and Washington, and the "Interagency Pass," which is valid for federal lands across the country. Doc. 94 at ¶¶ 104-107. But it is undisputed that one of those various passes and their associated fees is required to park at the Ramona Falls Trailhead.

The second component of the definition is more hotly contested, but in the end is subject to no genuine dispute on the summary judgment record. Dana first makes a purely legal argument, which proceeds as follows. Under the FLREA, the Forest Service may not charge a visitor "[s]olely for parking … along roads or trailsides." 16 U.S.C. § 6802(d)(1)(A). Rather, the Forest Service "may charge a standard amenity recreation fee" at an "area" only if the area has certain "amenities" beyond parking—a toilet, a trash can, an interpretive sign, picnic tables, and security services, *id*. § 6802(f)(4)(D)—and only if the area "provides significant opportunities for outdoor recreation," *id*. § 6802(f)(4)(A). The Forest Service manual reiterates these requirements. Doc. 86-27 at 12, § 32.2. According to Dana, these requirements necessarily imply that "the fee at issue was not solely for parking" and hence that it cannot qualify as a "parking fee" under Oregon law. Doc. 85 at 31, 33-34.

Dana's argument does not persuade. True, the FLREA provides that the Forest Service may charge a fee for parking only when it bundles parking with other amenities. But the FLREA does not require the Forest Service to charge *anyone* fees, let alone direct the Forest Service to charge pedestrians or bicyclists who use a recreation area's amenities. *See* 16 U.S.C. § 6802(f) (providing that the Forest service "*may* charge a standard amenity recreation fee") (emphasis

added).  That is significant because the pertinent question under the second component of the court's interpretation of term "parking fee" is whether the Forest Service in fact implements the FLREA by charging people without cars who use the Ramona Falls Trailhead.

The FLREA does not speak to that question, and the record indisputably shows that the answer is no: only those who park a vehicle must obtain the $5 pass that Johnson purchased.  As an initial matter, it is undisputed that the $5 fee is charged per vehicle, not per person.  Doc. 86 at ¶ 48.  The FLREA assumes that the Forest Service will charge the fee per vehicle, not per person, as it imposes joint liability on all occupants of "a vehicle charged with a nonpayment violation."  16 U.S.C. § 6811(c).  The actual pass that Johnson received is also tied to a vehicle. True enough, the pass is labeled a "Recreation Pass."  Doc. 86 at ¶ 106; *see* Doc. 75-7 at 1.  But the pass on both its front and back sides directs the user to "DISPLAY IN VEHICLE," Doc. 75-7 at 1-2, and states on the back side that "[t]he Recreation Day Pass is a *vehicle pass* honored at day-use sites in Oregon and Washington where 'Recreation Pass Required' signs are posted," *id.* at 2 (emphasis added).  The fact that the fee and the pass attach to a vehicle, not a person, necessarily implies that those who arrive without a car need not pay.

Deposition testimony confirms that only visitors who park must pay the fee and obtain a pass.  Watts testified that "the pass is for parking at the trailhead," that the pass is "tied to a vehicle," and that "to park at the trailhead, you must display valid recreation pass."  Doc. 86-15 at 55 (214:14, 214:16-18).  Even more explicitly, Watts testified that, "if you don't come in a vehicle or if you're dropped off, you can still participate in recreation on the site.  But if you park there, then you're required to display a pass. … So it's a vehicle pass, not a pass for individuals." *Id.* at 55 (216:7-13).  And Watts unambiguously testified that the Forest Service does not "collect fees from people that are hiking through, biking through, horseback riding through."  *Id.* at 55

12

(217:2-4).  In sum, Watts concluded, "you have to park there and have a vehicle to be required to pay a fee."  *Id.* at 56 (219:25-220:2).

Dana and James also understood that the passes purchased by Johnson each corresponded to a single vehicle.  Dana testified that Johnson went to a ranger station and "came back with the paper that you had to put in your car," Doc. 75-14 at 48:5-9, and offered her understanding that "in order to park at the trailhead you had to have a slip of paper on your dashboard," *id.* at 48:12-13.  James testified that Johnson "had gotten parking passes for both his car and our car."  Doc. 75-16 at 23:16-17.  Johnson himself was less clear on the exact purpose of the passes.  He understood that it was a "use pass for sites that require" a "day-use" pass.  Doc. 75-15 at 18:23-24.  He knew that "it's designed to hang in the car," but did not "know what it's for or what they would call it."  *Id.* at 19:2-5.

With the foregoing evidence, the United States has shown that visitors to the Ramona Falls Trailhead must purchase a recreation pass only if they park there.  To avoid summary judgment, Dana must adduce contrary evidence showing that the Forest Service charges non-parkers to use the trailhead.  *See Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015) ("If the moving party has properly supported [its] motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.").  Dana argues that the Forest Service's communications to the public through its website, signage at the trailhead, and a trail description flyer comprise such contrary evidence.  Doc. 85 at 31-32.  The court considers those materials in turn.

As for the Forest Service's website, Dana observes, correctly, that the website does not explicitly state that only those who park must pay the fee.  *Id.* at 32; Doc. 86 at ¶¶ 104-105, 113; Doc. 86-25.  But neither does the website state, explicitly or implicitly, that non-parkers must

pay.  Several pages of the website explain that "[r]ecreation passes and permits" cover the "day use fee" for certain "recreation sites," including the Ramona Falls Trailhead, but those pages do not specify who must acquire such passes or permits.  Doc. 86-25 at 6, 8-11.  A page titled "Ramona Falls Trailhead," however, explicitly ties the recreation pass requirement to a vehicle, explaining that the trailhead has a "[l]arge parking area" and that there is a fee of "$5/vehicle/day."  *Id*. at 1.  In sum, the website nowhere suggests that non-parkers must purchase a recreation pass to use a trailhead amenity; if anything, it conveys the contrary.

As for the signage at the Ramona Falls Trailhead, Dana highlights a sign that announces, "RECREATION FEE REQUIRED."  Doc. 85 at 17; Doc. 86 at ¶¶ 107, 113; *see* Doc. 75-12.  Again, it is immaterial under Oregon law that the fee is *called* a "recreation fee"—the pertinent question, rather, is whether non-parkers must pay it.  This particular sign does not speak to that question, but a different version of the same sign makes explicit that visitors must "display [a] valid pass when *parked* at this site."  Doc. 86 at ¶ 111; Doc. 86-28 at 29 (emphasis added).  Another sign at the trailhead plainly calls the recreation pass a "parking permit," stating: "All Trail Users must attain a Wilderness Permit.  This is different than your parking permit and is free but required for Wilderness entry."  Doc. 75-12.  Like the Forest Service website, the trailhead signage does not indicate that those arriving at the Ramona Falls Trailhead on foot or by bicycle must pay a fee; if anything, the signage conveys that only those obtaining a "parking permit" must pay.

The same holds for the trail description of the Ramona Falls Trail published by the Forest Service, which is reproduced here:

14

# Ramona Falls Trail #797

## Recreation Opportunity Guide



Northwest Forest Pass Required May 15-Oct 1

 

| | |
|---|---|
| Distance | 3.5 miles (one way) |
| Elevation | 2500-3500 feet |
| Snow Free | May to October |

More Difficult

**Trail Highlights:** This trail enters the Mount Hood Wilderness Area, part of the National Wilderness Preservation System. Ramona Falls is a jewel drawing visitors to the area. The Sandy River, a designated Wild and Scenic River, is a dramatic example of the forces that a glacial fed river can bring forth to change the landscape. Physical signs of a volcanic debris flow from over 200 years ago are evident where the trail is near the Sandy River.
**Please note:** Glacial river crossings on the flanks of the Mt. Hood Wilderness do not have foot bridges. Hikers should be prepared for dangerous river conditions. Please follow the River Crossing Safety Guidelines.

**Trail Description:** Most visitors access this trail from Ramona Falls Trailhead. The distance round trip for this point is 7 miles. From this trailhead, visitors take the Sandy River Trail one mile eastward to where it crosses the Sandy River. River crossings can be very dangerous without preparation, patience and planning. Please be sure you have chosen the safest time, safest place and best method to cross. Hikers should be prepared to turn back or wait for a more suitable time to cross if it appears to be too dangerous. Approximately ¼ mile after the crossing, visitors will come to the Ramona Falls "loop" itself. (The Pacific Crest National Scenic Trail #2000 overlaps with Ramona Falls for a couple miles in this area.) Equestrians going to Ramona Falls will stay on the southern side of the loop that goes along above the Sandy River. Hikers can choose which way to do the loop. It is about the same distance either way. Overall the route is a gentle climb gaining 1000' over the 3.5 miles to the falls.

## Regulations & Leave No Trace Information:
- Wilderness Permits are required between May 15 and Oct 15.
- Group size is limited to 12. Stock are counted in the group size. For example, 3 people riding their own horse plus a spare horse in the group for packing would make a group of 7.

**Leave No Trace**
- Stay off around the falls.
- Plan Ahead and Prepare: Prepare for extreme weather, hazards and emergencies.
- Travel and Camp on Durable Surfaces: Use established trails and campsites.
- Dispose of Waste Properly: Pack out all trash, leftover food and litter.
- Leave What You Find: Avoid introducing or transporting non-native species.
- Minimize Campfire Impacts: Use established fire rings & keep fires small.
- Respect Wildlife: Control pets at all times.
- Be Considerate of Other Visitors: Avoid loud voices and noises.

For information on *Leave No Trace*, go to www.LNT.org or call 1-800-332-4100

**For current trail conditions and more recreation information go to:**
http://www.fs.usda.gov/mthood

Map and driving directions on next page

| | |
|---|---|
| Mt. Hood National Forest | Zigzag Ranger District |
| 16400 Champion Way | 70220 E. Highway 26 |
| Sandy, OR 97055 | Zigzag, Oregon 97049 |
| 503-668-1700 | 503-622-3191 |

The USDA is an equal opportunity provider and employer.



**EXHIBIT Plf. 25**

0001

**Directions to Trailhead:** <u>From Portland, follow</u> US Highway 26 to Zigzag. Turn north on E. Lolo Pass Road (Forest Road 18). Follow it four miles. Turn east (right) onto Forest Road 1825 and continue 0.6 miles, turn right across a bridge and then continue 1.7 miles to a road junction. Bear left at the junction onto Forest Road 1825-100 and drive 0.3 mile. Take a left onto Forest Road 1825-024 to a large open parking lot (0.2 mile).

### 797 RAMONA FALLS
1.8 miles          2.8 km

RAMONA FALLS
#797

**Legend**

- Parking
- Recreation Trails
- Wilderness Boundary
- Highways
- Light-Duty Road, Paved
- Light-Duty Road, Gravel or Dirt
- Light-Duty Road, Native Material
- Unimproved Road: May Include 4WD and High-Clearance Roads

**Recommended maps:** Hood River Ranger District



0002

16

Doc. 86 at ¶ 103; Doc. 86-26 at 1-2.

Dana correctly notes that, at the top of the first page, the trail description states, "Northwest Forest Pass **Required** May 15-Oct 1." Doc. 86-26 at 1. Viewed in isolation, this might be read to obliquely suggest that everyone hiking to Ramona Falls must purchase a pass, regardless of whether they park a vehicle. But other parts of the trail description reveal an assumption that its readers will arrive by vehicle and park at the trailhead. The first page states that "[m]ost visitors access this trail from Ramona Falls Trailhead" and directs the reader to a "[m]ap and driving directions on [the] next page." *Ibid*. The second page gives driving directions to the "large open parking lot" at the trailhead. *Id*. at 2. Thus, in the context of the entire trail description, the initial statement "Northwest Forest Pass **Required**" cannot reasonably be construed as a mandate that pedestrians hiking or bicyclists riding to the Ramona Falls Trail must purchase a pass. And in the context of "the record taken as a whole," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), that initial statement does not put into reasonable dispute the proposition that pedestrians and bicyclists need not pay the fee. *See Madison v. Frazier*, 539 F.3d 646, 652 (7th Cir. 2008) ("The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient [to forestall summary judgment]; there must be evidence on which the jury could reasonably find for the non-moving party.").

Accordingly, even setting aside Watts's declaration, the record indisputably shows that that non-parkers need not pay any fee at the Ramona Falls Trailhead. And although no confirmation is necessary, Watts's declaration confirms this conclusion. Watts avers that people travel to the Mount Hood Wilderness "not only by car but also by foot and by bicycle," Doc. 75-5 at ¶ 15, and that "[h]iking, camping, skiing, and other recreational uses are all permitted

without any charge," *id*. at ¶ 16.  She further avers that "[v]isitors who park a vehicle in the Ramona Falls trailhead parking lot are required to pay a nominal fee," *id*. at ¶ 26, but that "[n]o charge is imposed upon a visitor who hikes in the forest or who uses the amenities offered at the trailhead as long as the visitor does not park a vehicle in the parking lot," *id*. at ¶ 33.  Dana adduces no evidence, including Watts's deposition testimony, that contradicts her averments.

In sum, the record indisputably shows that visitors to the Ramona Falls Trailhead were required to buy a Forest Service recreation pass only if they parked a car at the trailhead.  It follows under the court's interpretation of the Oregon recreational use statute's "parking fee" provision that a reasonable jury would have to find that the $5 fees that Johnson paid were "parking fee[s] of $15 or less per day."  Or. Rev. Stat. § 105.672(1)(c).  The United States therefore did not "make[] any charge for permission to use the land," *id*. § 105.688(3), and accordingly is immune from this suit under Oregon law.

**Conclusion**

Along with Brent's other family members and friends, Dana suffered an unimaginable loss on August 12, 2014.  She surely was entitled to seek redress against the United States under the FTCA.  Once she did, the FTCA entitled the United States to assert defenses established by Oregon law, including a defense that turns on the esoteric question whether the $5 fees paid by Johnson qualify as "parking fees" under the Oregon recreational use statute.  The court takes no pleasure in granting summary judgment to the United States, particularly based on that defense, but that is the correct result under the facts and law.  As noted, Dana's motion to strike Watts's

declaration is denied in part and denied as moot in part, and her motion to strike Kattell's

declaration is denied as moot. Judgment will be entered in favor of the United States.

January 11, 2021

_____

United States District Judge